AO 106 (Rev. 01/09) Application for a Search Warrant

# United States District Court
### for the
### Western District of New York

## In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

A 2016 Ford Explorer, gray in color, license plate HDY-9308,
VIN 1FM5K8F83GGB30508, registered to "SBC Telecom Consulting, Inc."          Case No. 16-M- *158*

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

A 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, registered to "SBC Telecom further described in Attachment A,

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, Items to be Searched for and Seized.

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18 U.S.C. § § 1341 and 2 (Mail Fraud).

The application is based on these facts:

- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

KATHLEEN M. BOYCE
SPECIAL AGENT
Department of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   October 2 , 2016

*Judge's signature*

H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

City and state:  Buffalo, New York

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK  )
COUNTY OF ERIE      )    SS:
CITY OF BUFFALO    )

      I, KATHLEEN M. BOYCE, being duly sworn, deposes and says:

## INTRODUCTION AND AGENT BACKGROUND

    1.    I am a Special Agent for United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have held such position since August 2010. I am currently assigned to the Special Agent in Charge (SAC) Buffalo, New York office located within the Western District of New York. As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

    2.    I make this Affidavit in support of an application for a search warrant for a 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, registered to "SBC Telecom Consulting, Inc." a company filed with New York State Department of State on January 6, 2014 with an address of 35 Chestnut Street, #171, Salamanca, New York 14779.

    3.    This investigation has revealed that 35 Chestnut Street, #171, Salamanca, New York 14779 is a Post Office located in Salamanca, New York. Further, the investigation has determined that Sergiy Bezrukov ("BEZRUKOV"), a/k/a John Butler, a/k/a Thomas Paris,

a/k/a Christopher Riley a/k/a Chris Riley opened and continues to maintain Post Office Box #171 at the Salamanca Post office and that mail for SBC Telecom Consulting, Inc. is received at the P.O. Box. (Exhibit 3, ¶14).

4.      The statements contained in this Affidavit are based upon observations by your affiant, information from other law enforcement officers, and my experience and training. Because this Affidavit is being submitted for the limited purpose of securing a search warrant for a 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, I have not included each and every fact known to me and have set forth only the facts that I believe are necessary to establish probable cause to search the 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508.

5.      As indicated in the affidavit for the criminal complaint charging Sergiy Bezrukov ("BEZRUKOV"), a/k/a John Butler, a/k/a Thomas Paris, a/k/a Christopher Riley a/k/a Chris Riley with a violation of Title 18, United States Code, Sections 1341 and 2, this investigation has established probable cause to believe that BEZRUKOV has committed violations of 18 U.S.C. Sections 1341 and 2 (Mail Fraud) by knowingly and with the intent to defraud, using the U.S. Mails to execute a scheme or artifice to defraud individuals and small businesses, by means of false or fraudulent representations or promises. [Exhibit 1].

6.      On October 27, 2016, at approximately 8:00 a.m., your affiant and other federal agents approached BEZRUKOV to execute an arrest warrant.  [Exhibit 2].  As agents approached BEZRUKOV, he opened the driver door of the 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, registered to "SBC Telecom Consulting, Inc.", in an attempt to enter the vehicle, parked in a spot outside of 171 Melinda Drive, Salamanca, New York, the address where BEZRUKOV was known to reside.

7.      As a safety precaution and pursuant to standard procedure, agents conducted a security sweep of the vehicle to check for weapons and other persons. At that time, your affiant observed a bank receipt inside the vehicle and another federal agent also observed multiple bank receipts from various banking institutions.  It is your affiant's belief that, based on the items indicated in Exhibit 3, that such items seen in the vehicle are relevant to the charges and may be instrumentalities of the crimes. [Exhibit 3].

## CONCLUSION

8.      Based on the foregoing, I respectfully submit that these facts and the investigative efforts to date establish probable cause to believe that Corporate Restructure, Inc., under the direction of Sergiy BEZRUKOV, committed acts in violation of Title 18, United States Code, Section 1341 and 2(Mail Fraud).  Such efforts also establish probable cause to believe that evidence, fruits and instrumentalities of such violations will be found in the 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, registered to "SBC Telecom Consulting, Inc.", a vehicle associated

with Sergiy BEZRUKOV, which he was attempting to enter when the arrest warrant was being executed.

**WHEREFORE**, in consideration of the foregoing, it is respectfully requested that this Court issue the requested search warrant authorizing the search of the 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, registered to "SBC Telecom Consulting, Inc.", located outside of 171 Melinda Drive, Salamanca, New York, 14779 described in **Attachment A,** for the items described in **Attachment B**.


KATHLEEN M. BOYCE
Special Agent
Homeland Security Investigations


Sworn to before me this 27th
day of October, 2016.

H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

### ATTACHMENT A
**Properties to be Searched**

All areas of a 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, registered to "SBC Telecom Consulting, Inc."









**ATTACHMENT B**

**ITEMS TO BE SEARCHED FOR AND SEIZED FROM A 2016 FORD EXPLORER, GRAY IN COLOR, LICENSE PLATE HDY-9308, VIN 1FM5K8F83GGB30508, REGISTERED TO "SBC TELECOM CONSULTING, INC."**

The evidence to be searched for and seized from a 2016 Ford Explorer, gray in color, license plate HDY-9308, VIN 1FM5K8F83GGB30508, registered to "SBC Telecom Consulting, Inc." are the following records and documents, whether maintained in paper or electronic form:[1]

    a.    <u>Financial records</u>: including and limited to: documents, records, and items related to the income, expenses, assets, liabilities, and financial transactions of Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; and/or any and all of the following entities/business names:

        -ARP Software Holdings Corp.;
        -Business Application Services, LLC;
        -Clear Call Systems, Inc.;
        -Community Legal Aid Services, Inc.;
        -Corporate Restructure, Inc.;
        -Corporate Restructure, Ltd.;
        -Corporate Services SAP, Inc.;
        -E-Business Suite, Inc.;
        -Ecommerce Services Spa, LLC;
        -Enterprise Source Spa, LLC;
        -First Nations BPO, LLC;
        -FSS Solutions, Inc.;
        -Hosted Call Center
        -IBS Real Estate Holdings, Inc;
        -Idebt, Ltd.;
        -JCM Process Flr, LLC;
        -Michaels and Michaels Partners, Inc.;
        -Native Corp Restructure, Ltd.;
        -Open Integrated Solutions, LLC;
        -Open Source BPO, Inc.;

---

[1]    The terms "records" and "documents" include all of the items of evidence in whatever form and by whatever means such records or documents, (including drafts and modifications thereof), may have been created or stored.

-PBX Consulting, LLC;
-Peoplesoft Solutions, LLC;
-Salamanca Payroll Services, Inc.;
-SAP Solutions, LLC;
-SBC Telecom Consulting, Inc.;
-Seneca BPO, LLC;
-Seneca Nation Payroll Solutions, Inc.;
-Single Process Integration, Inc.;
-Sparc Platform Services, Inc;
-Weblogic, LLC
-Any other business entities associated with Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith;

Such records are to include accounting records, such as financial statements, ledgers, journals, invoices, check registers, stamps, notes, correspondence, and records of business and personal expenditures; records reflecting income; and records evidencing the receipt or disbursement of funds;

b.  Bank records: for any and all accounts and documents associated with bank records, opened, used, or controlled by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher Riley a/k/a Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith and/or utilizing any of the business names set forth in subparagraph(a)above, including and limited to:  account opening documents, statements, deposit tickets, cancelled checks, check registers, receipt books, wire transfers, official checks, cashier's checks, money orders, investment statements, foreign banking records, and safe deposit box records and keys;

c.  Client/Customer Lists: in any form, including lists of telephone numbers, addresses, rolodexes, calendars, and appointment books.

d.  Business and personal records: for, relating, or referring to, Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John

2

Butler, a/k/a Christopher Riley a/k/a Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; and/or utilizing any of the business names set forth in subparagraph (a) above,  including and limited to: client profiles, client agreements, client contracts, client power of attorney forms, client authorization agreement for direct deposit and direct payments, client notice regarding availability of electronic filing New York State Supreme Court cases, telephone scripts, telephone logs, telephone messages, calendars, calendar entries, diaries, client debt portfolios, lists of debtors, and debt payment details, correspondence, faxes, letterhead, payroll records, employee files, solicitation letters, mailing envelopes, notes, memoranda, and/or mailings;

e.  Business and/or personal records: relating or referring to the rental of office space, United States Post Office Boxes, mail boxes with Commercial Mail Receiving Agencies (i.e. United Parcel Service, Federal Express, etc,) and/or telephone and internet service by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher Riley a/k/a Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith and/or utilizing any of the business names set forth in subparagraph (a) above, including lease/rental agreements, contracts, statements, applications, and records reflecting the dates, amounts and methods of payments made for rental of office space, United States Post Office Boxes, mail boxes with Commercial Mail Receiving Agencies (i.e. United Parcel Service, Federal Express, etc,) and/or telephone and internet service;

f.  Credit card records for any and all credit card accounts opened, used or controlled by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher Riley a/k/a Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; and/or utilizing any of the business names set forth in subparagraph (a) above, including and limited to:  statements, applications, records reflecting items purchased and the dates such items were purchased,

3

and records reflecting the dates, amounts and methods of payments made on any such accounts;

g.   <u>Evidence relating to the acquisition of assets:</u> by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher Riley a/k/a Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; individually, or utilizing any of the business names set forth in subparagraph (a) above, including and limited to: real estate records, vehicle titles and other records, loan records, records relating to brokerage accounts, and records relating to the purchase of stocks or other investments;

h.   <u>Computers and Electronic Media:</u> The seizure and/or copying of the below electronic media and related materials to allow for and assist in the search for the records and items listed above in a forensic laboratory setting:

   1)   All of the above-described documentation and records stored on/in computer floppy disks, thumb devices, CD's, DVD's, tape media, or other electronic media that may contain copies of computer programs and/or files.

   2)   All of the above-described documentation and records stored on/in computer hardware to include, but is not limited to, any data processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices and electronic tone-generating devices); as well as any device, mechanism or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

3) Computer software stored in electronic, magnetic, optical or other digital form. Including programs to run operating systems, application (like word processing, graphics or spreadsheet programs), utilities, interpreters, and communications programs.

4) Computer-related documentation consists of written, recorded, printed or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

5) Computer passwords and other data security devices designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusual, as well as reverse the process to restore it.

6) Keys, passwords or combinations used to secure items stored in a safe or similar locked box or compartment or computer or other electronic device within the premises described in **Attachment** A. All items more fully described in **Attachment B** that are stored in any such safe, locked box or compartment.

i.   <u>Cellular Telephone(s):</u>

1) Cellular telephones frequently have telephone directory features, as well as methods to learn the telephone number associated with other cell phones.  Cellular telephones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names.

2) Cellular telephones typically have voice mail and/or text-messaging features, which permit the cellular telephone user to send and receive voice mail and/or text messages.  Voice mail and text messages are typically stored on the computer network of the provider of the cell phone's telephone service,

5

which network is external to the cell phone.  Sent and received text messages may also be stored on the cell phone itself.

3)     Cellular telephones with camera functions permit the cell phone user to take photographs and/or videos that are stored on the cell phone itself.

4)     The information described in subparagraphs (g), (h) and (i) above, usually remains accessible in the cell phone's memory card even if the cell phone has lost all battery power, and not been used for an extended period of time.

5)     Certain electronic devices, including i-Phones, Blackberries, i-Pods, and Android phones, store information such as email messages, chats, multimedia messages, installed applications or other electronic communications, calendars, notes, passwords, dictionary entries, Global Positioning Satellite (GPS) entries, internet protocol connections, and location entries, including cell tower and WiFi entries, and internet or browser entries or history.  In addition, these devices often contain proprietary software, in the form of system, data, or configuration information, which enable the types of information and data described above to be accessed and analyzed.  These items remained stored on the electronic devices even if the device in question has lost all battery power, and has not been used for an extended period of time.

j.     <u>Photographs</u>:  entry and exit photographs of the locations to be searched, as well as photographs of the specific places in which items are found and from which items are seized.

AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

### for the
### Western District of New York

**United States of America**

**v.**

**Sergiy Bezrukov, a/k/a John Butler, a/k/a Thomas Paris,
a/k/a Christopher Riley a/k/a Chris Riley**

Case No. 16-M- *157*



### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Since at least December 26, 2015 and continuing through at least October 7, 2016, in the County of Erie, in the Western District of New York, the defendant did knowingly commit Mail Fraud, in violation of Title 18, United States Code, Sections 1341 and 2.

This Criminal Complaint is based on these facts:

☒  Continued on the attached sheet.

_____
*Complainant's signature*

CLINTON E. HOMER
Postal Inspector
U.S. Postal Inspection Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  October 26, 2016

_____
*Judge's signature*

City and State:  Buffalo, New York

H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK   )
COUNTY OF ERIE        )        SS:
CITY OF BUFFALO       )

I, CLINTON E. HOMER, being duly sworn, deposes and says:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Postal Inspector for the United States Postal Inspection Service stationed at the Buffalo, New York Field Office, and have held such position since July 6, 2005.  I am currently assigned to investigate Postal Crimes within the Western District of New York.

2.      As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      I make this Affidavit in support of an application for a Criminal Complaint and arrest warrant charging Sergiy Bezrukov ("BEZRUKOV"), a/k/a John Butler, a/k/a Thomas Paris, a/k/a Christopher Riley, a/k/a Chris Riley, with violations of Title 18, United States Code, Sections 1341 and 2 (Mail Fraud).

4.      The statements contained in this Affidavit are based upon my investigation, information provided by bank fraud investigators, interviews conducted by your affiant, and on my experience and training as a Postal Inspector.  Because this Affidavit is being submitted for the limited purpose of securing a Criminal Complaint and arrest warrant, I have not included each and every fact known to me and have set forth only the facts that I believe are

necessary to establish probable cause that SERGIY BEZRUKOV committed a violation of Title 18, United States Code, Sections 1341 and 2.

5.     As more fully set out below, the investigation has established probable cause to believe that BEZRUKOV has committed violations of 18 U.S.C. Sections 1341 and 2 (Mail Fraud) by knowingly and with the intent to defraud, using the U.S. Mails to execute a scheme or artifice to defraud individuals and small businesses, by means of false or fraudulent representations or promises.

Title 18, United States Code Section 1341 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by false pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowing causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing . . . [shall have committed mail fraud].

THE SCHEME

6.     The scheme involves BEZRUKOV's use of the United States Postal Service to mail fraudulent solicitations to small business owners to obtain monies from the victim businesses. In order to aid in the hiding of the location of his business as well as foster his processing of illicit funds received from his clients, BEZRUKOV used aliases, including "John Butler", "Thomas Paris",  "Christopher Riley" or "Chris Riley"; operated under at least 30 different business names; directed the processing and movement of funds through at

2

least 10 different banks; and employed or controlled a number of U.S. Postal Service Post Office Boxes and Commercial Mail Receiving Agent (CMRA) boxes at UPS Stores throughout Western New York.

7.     On or about August 26, 2016, the Postal Inspection Service received a referral from a fraud investigator for Citizens Bank related to multiple accounts with suspicious activity. The accounts were held by Mark Farnham and Dustin Walker and involved deposits of a large number of paper drafts, many returned as worthless after being deposited. When the drafts would clear, all withdrawals from the accounts were received in the form of cash or official bank checks. Between June 21, 2016 and August 12, 2016, in excess of $125,000.00 was deposited into the Mark Farnham and Dustin Walker accounts.

8.     Farnham's Citizens Bank accounts were opened using an address of 35 Chestnut Street, Suite 161, Salamanca, New York, 14779. The address of 35 Chestnut Street, Suite 161, Salamanca, New York is actually a post office box located at the U.S. Post Office in Salamanca, New York. Mark Farnham is not employed by the Postal Service nor does he work at the Salamanca Post Office.

## USE OF THE MAILS

9.     ·  Your affiant obtained a copy of the application for P.O. Box 161 from the Salamanca Post Office. The box had been opened on December 26, 2015 by Sergiy BEZRUKOV. BEZRUKOV opened the box to receive mail for three listed businesses, namely "SBC Telecom Consulting Inc."; "Corporate Restructure Inc."; and "NBR Solutions

Inc". On the same date, BEZRUKOV opened P.O. Box 171 at the Salamanca Post Office to receive mail for two additional businesses, namely, "SBC Telecom Consulting Inc". and "Corporate Settlement Corporation". BEZRUKOV continues to maintain both post office boxes.

10.     During the course of this investigation, your affiant identified post office boxes and/or boxes at UPS Stores in Salamanca, Jamestown, Irving, West Seneca, Cheektowaga, Buffalo and Sanborn, New York opened or used by BEZRUKOV in furtherance of his fraud scheme.

11.     Through the course of the ensuing investigation, your affiant has learned that Mark Farnham and Dustin Walker were employees of BEZRUKOV, and at BEZRUKOV's direction, deposited paper drafts received from victim business into bank accounts they opened fraudulently, as part of BEZRUKOV's fraudulent debt reduction/restructure business. The paper drafts were created by other BEZRUKOV employees at his Salamanca, New York offices.

12.     On or about September 20, 2016, your affiant spoke with A.M.S., owner and operator of a small business. In late 2015, A.M.S. was engaged in a loan from Yellowstone Capital, LLC, a high interest, short-term lender, making the daily payments as required.

13.     Before A.M.S. had completed the term of the loan from Yellowstone, in November 2015, she received a solicitation in the mail from Corporate Restructure, Inc. The

letter advised A.M.S. that Corporate Restructure, Inc. could reduce her short term business debt by up to 75% within 48 hours.  A.M.S. called the telephone number provided, resulting in her working with "Thomas Paris" and one of his associates, "Emily Goldstein", over the telephone and via email, to restructure her short-term, high interest business debt.  Emily Goldstein is an alias used by BEZRUKOV's girlfriend and business partner.

14.     Paris and Goldstein described Corporate Restructure, Inc. as a company that represented small businesses which were being taken advantage of by short-term high interest lenders.  For $1,250.00 per week for 4 weeks, Corporate Restructure, Inc. would work through the courts to get A.M.S.'s interest rate reduced and repayment term extended, resulting in a reduction in her payments to Yellowstone from $400.00 per day to $1,500.00 per month.  A.M.S. agreed to Paris' and Goldstein's offer.

15.     A.M.S. received a contract and several other forms from Corporate Restructure, Inc., which she completed, signed and returned.  Once making the initial $1,250.00 payment to Corporate Restructure, Inc., via wire transfer, Paris and Goldstein advised A.M.S. to block Yellowstone from making withdrawals from her account, and to cease all contact with them, as they would now be representing her in the repayment going forward.

16.     Before completing her payments to Corporate Restructure, Inc., A.M.S. was contacted by a debt collector for Yellowstone, and advised her loan was in a default status due to non-payment.  A.M.S. continually attempted to contact Paris and Goldstein by

telephone and email, but they failed to respond.  She finally emailed Goldstein, simply informing her that she had decided to sever her relationship with Corporate Restructure, Inc. A.M.S. received an immediate response from Goldstein, informing her that she had been fired as a client due to non-payment.

17.    At the conclusion of the interview, A.M.S. agreed to send your affiant copies of all documentation, some received via the U.S. the mail, along with email exchanges she had retained from her experience with Corporate Restructure, Inc., Thomas Paris and Emily Goldstein.  Included in the packet of documents and correspondence received from A.M.S., was a copy of the contract Corporate Restructure, Inc. had prepared for A.M.S. to sign, to secure their debt repayment/restructure relationship.

18.    Also included in the packet received from A.M.S. was a copy of a second solicitation letter received on March 23, 2016 from Corporate Restructure, Inc. delivered via the U.S. mail.  The two-page letter, with a return address of 266 Elmwood Avenue, Suite 950, Buffalo, New York, 14222, advised A.M.S. that her business debt could be reduced by up to 75% within 6-12 hours.  The letter was signed, Thomas Paris, Corporate Debt Advisor. [Exhibit 1].

19.    The investigation has determined that 266 Elmwood Avenue, Suite 950, Buffalo, New York, 14222 was confirmed to be a UPS Store mail box issued to BEZRUKOV.

20.     Pursuant to this investigation, your affiant obtained additional records from the United States Postal Service.  It was discovered that on August 1, 2016, Mark Farnham had applied for and was granted a permit to mail large volumes of Standard Mail from the Salamanca Post Office in Salamanca, New York.  The address Farnham listed on the permit was 255 Rochester Street, Suite 6, Salamanca, NY, 14779.  Your affiant has confirmed this to be physical location of BEZRUKOV's fraudulent debt reduction/restructuring operation.

21.     In compliance with postal regulations, on two occasions, examples of the contents of the mailings were supplied to the Salamanca Post Office.  Both mailings were solicitations promising to reduce small business owner's short term debt by as much as 75% in just 6 to 12 hours.  The first letter was signed "Chris Riley", the second was signed Robert Foss.  On each letter, the return address was a post office box or UPS Store mail box

22.     Records, surveillance and witness interviews have confirmed BEZRUKOV created the contents of the bulk mailings, oversaw their production and preparation for mailing at his 255 Rochester Street, Suite 6, Salamanca, New York offices, and paid the postage to have approximately 75,000 of the mailings were mailed between the first week of August and first week of October 2016.

## CONCLUSION

23.     As a result of the activity of SERGIY BEZRUKOV, a/k/a John Butler, a/k/a Thomas Paris a/k/a Christopher Riley a/k/a Chis Riley, over 100 victims, suffering losses in excess of $500,000.00, have been identified.  The victims and losses are the direct result of

7

BEZRUKOV's scheme involving the mailing of thousands of fraudulent solicitations to vulnerable small business owners, luring them into paying him for a service he never intended to provide, and resulting in hundreds of defaulted loans, worth hundreds of thousands of dollars. BEZRUKOV used several aliases, over 30 different company names, numerous banks, post office boxes, UPS Store boxes, and employees in an effort to ensure the success of his scheme, and in an effort to hide his true identity and location of operations.

WHEREFORE, based on the forgoing, I respectfully submit that there is probable cause to believe that SERGIY BEZRUKOV did knowingly commit Mail Fraud in violation of Title 18, United States Code, Section 1341, and 2. It is respectfully requested, based upon the above information, that this court issue a Criminal Complaint and arrest warrant for SERGIY BEZRUKOV.

CLINT E. HOMER
Postal Inspector
U.S. Postal Inspection Service

Sworn to before me this 26th
day of October, 2016.

H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

8

266 ELMWOOD AVE
STE 950
BUFFALO, NEW YORK 14222



Corporate Restructure Inc



Original Loan Type:  Merchant Loan
Original Account Date: 2015
LOAN ID 4334-11
Current Restructure Amount: $100,000.00 - $25,000.00 or 75%
Open Merchant Cash Advance Balance **(Monthly Payments option)**

March 23, 2016

Dear

Get Debt Relief for your business. Get your business out of debt within your limited monthly budget. Here's an affordable program that has resolved over 40,000 debts.

If you **have current merchant cash advance debt** you are pre-considered for the above referenced debt restructure in the amount of $100,000.00 and we can **reduce the debt** to $25,000.00. This letter therefore, confirms that, as an offer, you can apply to this office, with the following amounts and we can **reduce your debt by 75%** within **6-12 hours of** corporate restructuring and structure **monthly payments** with your creditors. We are a New York corporate debt restructuring firm with comprehensive and wide-ranging experience in the defense of Commercial Debtors, in individual and class actions brought under the Fair Debt Collection Practices Act, Fair Credit Reporting Act, Truth in Lending Act, all related commercial torts, associated state protections laws, and administrative/regulatory actions. This firm has earned a national reputation for its defense and commercial debt counselors, serving as compliance and defense for "**Merchant buyers**" of the **merchant cash advance** and/or **fixed daily** receivables advances. Many and/or if not all carry a **200%** APR annual compounded rate per year.

Upon receipt and clearance of your documents as agreed, we will notify you with the restructuring terms and restructure all commercial debt on **a monthly payment** within the following day regarding this account. The monthly restructures are guaranteed upon account approval. Creditor provisions and defense outcomes apply.
THIS IS A NOTICE TO LOWER YOUR BUSINESS CURRENT DEBT IF NECESSARY AND IS REQUESTED BY THE CLIENT. THIS IS NOT IN ANY WAY AN ATTEMPT TO COLLECT ANY DEBT.

Should you have any questions, please do not hesitate to contact our office at 866-936-2015.

Sincerely,
/s/
Thomas Paris
Corporate Debt Advisor (CDA)
tparis@corporaterestructurecorp.com

Toll-free 866-936-2015
*Hours of operations Monday – Friday, 8:00AM – 7:00PM Saturday 9:00am – 3:00pm Eastern time-zone*
NOTICE: RESIDENTS OF CALIFORNIA, PENNSYLVANIA, VERMONT, MAINE, NEVADA, NORTH CAROLINA, FLORIDA, AND UTAH
PLEASE CONTACT US DIRECTLY FOR A DISCLOSURE STATEMENT FOR IMPORTANT INFORMATION.
*This communication is from a commercial debt restructuring company and not a law firm. Please note, you are hereby notified that we are not a law firm. Past outcomes do not predict future outcomes.*

*Revised 09/14/2015*

**CAUTION:**
**This is not an**
**amendment.**

## UCC RESTRUCTURE INFORMATION STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Thomas Paris  866-936-2015

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Mailed directly to the client VIA First Class Mail.
At the most recent business address.

Corporate Restructure, Inc.
266 Elmwood Ave. Ste 950
Buffalo, NY 14222
Reduction Applications
VIA Phone  866-936-2015
VIA Fax 201-474-7247
www.corporaterestructureinc.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. Identification of the RECORD to which this INFORMATION STATEMENT relates

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. RECORD INFORMATION TO WHICH THIS INFORMATION STATEMENT RELATES |
|---|---|
| OFFER TO REDUCE PAYMENTS ON LOAN ID 4334-11 | |

2. Check one of these three boxes to indicate the claim made by this INFORMATION STATEMENT

2a. ☐ LOAN IS INACCURATE. Enter in item 3 the basis for the belief by the Debtor of Record identified in item 5 that the RECORD identified in item 1 is inaccurate and indicate the manner in which the person believes the RECORD should be amended to cure the inaccuracy

2b. ☐ LOAN WAS WRONGFULLY FILED. Enter in item 3 the basis for the belief by the Debtor of Record identified in item 5 that the RECORD identified in item 1 was wrongfully filed

2c. ☐ LOAN FILED BY PERSON NOT ENTITLED TO DO SO. Enter in item 3 the basis for the belief by the Secured Party of Record that the person that filed the RECORD identified in item 1 was not entitled to do so under UCC Section 9-509

3. Basis for claim of box checked in item 2

Dear Business Client,

Are Cash Advances Killing your Business?

Based on multiple UCC FILINGS and/or LIEN FILLINGS your business is approved for **80% REDUCTION** OF YOUR CASH ADVANCE BALANCE within **6-12 hours**.

On average, our clients have reduced their cash advance payments by 80% .

Our Program can improve your cash flow, save you money and even save your business.

Restructure 1st, 2nd, 3rd position UCC loans in one monthly affordable payment.

Restructure Offer Expires within 7 business days

**\*\*Credit provisions and defense outcomes apply**

4. If this INFORMATION STATEMENT relates to a RECORD filed [or recorded] in a filing office described in Section 9-501(a)(1) and this INFORMATION STATEMENT is filed in such a filing office, provide the date [and time] on which the INITIAL FINANCING STATEMENT identified in item 1a above was filed [or recorded]

| 4a. DATE | 4b. TIME |
|---|---|
| | |

5. NAME of PERSON filing this INFORMATION STATEMENT

5a. ORGANIZATION'S NAME

OR   **Corporate Restructure Inc**

| 5b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| Paris | Thomas | | |

FILING OFFICE COPY — INFORMATION STATEMENT (Form UCC5) (Rev. 07/19/12)

US POSTAGE
$00.46
First-Class

Mailed From 10001
03/24/2016
032A 0061830736

NEW YORK NY 100

24 MAR 2016 PM

AO 442 (Rev. 11/11) Arrest Warrant

# United States District Court
### for the
### Western District of New York

**United States of America**

v.

**Sergiy Bezrukov, a/k/a John Butler, a/k/a Thomas Paris, a/k/a
Christopher Riley a/k/a Chris Riley**

(SEALED)

Case No. 16-M- *157*

---

*Defendant*

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay **SERGIY BEZRUKOV**, who is accused of an offense or violation based on the following document filed with the Court:

☐ Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☒ Complaint

☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:

Since at least December 26, 2015 and continuing through at least October 7, 2016, in the County of Erie, in the Western District of New York, the defendant did knowingly commit Mail Fraud, in violation of Title 18, United States Code, Sections 1341 and 2.

Date: *October 26, 2016*

_____
*Issuing officer's signature*

City and State:  Buffalo, New York

H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

---

### Return

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____, at *(city and state)* _____.

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*

AO 106 (Rev. 01/09) Application for a Search Warrant

# United States District Court
## for the
### Western District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

Corporate Restructure, Inc., 255 Rochester Street, Suite 6, Salamanca, NY 14779
and 1841 Seneca Street, Buffalo, New York 14210

Case No. 16-M-155

## AMENDED APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Corporate Restructure, Inc., 255 Rochester Street, Suite 6, Salamanca, NY 14779 and 1841 Seneca Street, Buffalo, New York 14210, as further described in Attachment A,

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, Items to be Searched for and Seized at Premises.

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18 U.S.C. § 1341 (Mail Fraud).

The application is based on these facts:

- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

CLINTON E. HOMER
POSTAL INSPECTOR
U.S. Postal Inspection Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  October 27, 2016

_____
*Judge's signature*

City and state:  Buffalo, New York

H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

## ATTACHMENT A
### Properties to be Searched

### 255 Rochester Street, Suite 6, Salamanca, New York, 14779

255 Rochester Street, Suite 6, Salamanca, NY, 14779, is office space contained within a warehouse-style building located at 255 Rochester Street, Salamanca, NY, 14779. It is an East-facing structure located on Rochester Street between North Main Street and Gravel Pit Road. The South side of the structure faces Rochester Street; the front entrance of the structure faces East (Gravel Pit Road). There is parking on the East and West sides of the building, connected by a wrap-around driveway on the North end of the structure. There are loading docks along the entire West side (rear) of the building. The structure is constructed primarily of cinder block, although there are also small sections of brick and of wood. The structure is painted tan or cream colored, with dark brown trim. The building has a flat roof. There is a large satellite dish mounted on the roof at the south end. On both the East and West sides of the building, at the South end near Rochester Street, is a large white sign bearing the number '255' in black digits. On the East side above the '255' is a black sign outlined in red, which reads "Snyder Manufacturing" in gold lettering. The same sign appears immediately adjacent on the South side of the building, so that the signs are joined together on the Southeast corner of the structure.

The main entrance to the building is on the East side. It includes a small A-frame roofed foyer with an outer and inner door. The entire foyer is dark brown, with a metal roof. The outer door is constructed of metal, with a large window in the top half. Affixed to the outside wall to the right of the door is a white sign with black lettering which reads "SECURITY NOTICE Video surveillance in use on these premises". Below the sign, a silver metal "butt stop" cigarette disposal container is affixed to the wall.

Above the main building entrance on the East side of the structure, is a sign for the Cattaraugus Probation Department. The sign is white with black lettering, and includes a pained logo of an orange sun setting behind green hills and a blue lake. At the bottom of the blue lake portion of the painting are the words "Enchanted Mountains" in white lettering. Mounted above the sign, at the peak of the foyer roof, is a spotlight which shines down on the area in front of the entrance.

Suite 6 is reached by entering through the outer and inner doors and into the building. Suite 6 is to the right (North) of the probation department offices within the building. It is reached by walking to the end of the hallway. The outer door to Suite 6 is a solid wood door, with the door handle on the left side. The door is secured with a keypad lock. Directly above the center of the door which leads into Suite 6 is a security camera, mounted to the wall.

The area to be searched would include all office and workroom space to be contained within, or which is directly accessible from Suite 6.






**1841 Seneca Street, Buffalo, New York, 14210**

1841 Seneca Street, Buffalo, NY, 14210, is a commercial property which faces northeast. It is a single story structure with a flat roof and single man doors in both the front and rear (southwest) of the building. The front door is made of glass, with a metal frame. There is a large glass window on both the left and right sides of the front door. The door at the rear of the building is solid metal, painted brown. The front of the building is constructed of red brick. The sides and rear wall of the building are covered in tan stucco.

There is a parking area for 3 to 4 vehicles on the left (southeast) side of the building, and parking for approximately 5 vehicles in the rear. The parking areas and a wrap-around drive around the building are paved.

There are 8 smaller windows all in a row on the southeast side of the building, as well as on the northwest side. There is a white light fixture mounted directly above the rear door.

The front door has a handle on the right side; directly below the handle is a silver lockset for a key. Affixed to the upper half of the front door in green is "18    -41 Seneca Street". Directly below the "18" is a decal depicting the American flag. Above the door, on a separate small pane of glass is the number "1841". The digits are black against a white background.

To the immediate right of the front door, between the door and window, there is a black and silver metal mailbox affixed to the wall.



## ATTACHMENT B

## ITEMS TO BE SEARCHED FOR AND SEIZED AT PREMISES

The evidence to be searched for and seized at the businesses located at 1841 Seneca Street, Buffalo, NY 14210 and 255 Rochester Street, Suite 6, Salamanca, NY 14779, are the following records and documents, whether maintained in paper or electronic form:[1]

a.   Financial records: including and limited to: documents, records, and items related to the income, expenses, assets, liabilities, and financial transactions of Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; and/or any and all of the following entities/business names:

-ARP Software Holdings Corp.;
-Business Application Services, LLC;
-Clear Call Systems, Inc.;
-Community Legal Aid Services, Inc.;
-Corporate Restructure, Inc.;
-Corporate Restructure, Ltd.;
-Corporate Services SAP, Inc.;
-E-Business Suite, Inc.;
-Ecommerce Services Spa, LLC;
-Enterprise Source Spa, LLC;
-First Nations BPO, LLC;
-FSS Solutions, Inc.;
-Hosted Call Center
-IBS Real Estate Holdings, Inc;
-Idebt, Ltd.;
-JCM Process Flr, LLC;
-Michaels and Michaels Partners, Inc.;
-Native Corp Restructure, Ltd.;
-Open Integrated Solutions, LLC;
-Open Source BPO, Inc.;
-PBX Consulting, LLC;
-Peoplesoft Solutions, LLC;
-Salamanca Payroll Services, Inc.;

---

[1]   The terms "records" and "documents" include all of the items of evidence in whatever form and by whatever means such records or documents, (including drafts and modifications thereof), may have been created or stored.

-SAP Solutions, LLC;
-SBC Telecom Consulting, Inc.;
-Seneca BPO, LLC;
-Seneca Nation Payroll Solutions, Inc.;
-Single Process Integration, Inc.;
-Sparc Platform Services, Inc;
-Weblogic, LLC
-Any other business entities associated with Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith;

Such records are to include accounting records, such as financial statements, ledgers, journals, invoices, check registers, stamps, notes, correspondence, and records of business and personal expenditures; records reflecting income; and records evidencing the receipt or disbursement of funds;

b.   Bank records: for any and all accounts opened, used, or controlled by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith and/or utilizing any of the business names set forth in subparagraph(a)above, including and limited to: account opening documents, statements, deposit tickets, cancelled checks, check registers, receipt books, wire transfers, official checks, cashier's checks, money orders, investment statements, foreign banking records, and safe deposit box records and keys;

c.   Client/Customer Lists: in any form, including lists of telephone numbers, addresses, rolodexes, calendars, and appointment books.

d.   Business and personal records: for, relating, or referring to, Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins;

Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; and/or utilizing any of the business names set forth in subparagraph (a) above,  including and limited to: client profiles, client agreements, client contracts, client power of attorney forms, client authorization agreement for direct deposit and direct payments, client notice regarding availability of electronic filing New York State Supreme Court cases, telephone scripts, telephone logs, telephone messages, calendars, calendar entries, diaries, client debt portfolios, lists of debtors, and debt payment details, correspondence, faxes, letterhead, payroll records, employee files, solicitation letters, mailing envelopes, notes, memoranda, and/or mailings;

e.      Business and/or personal records: relating or referring to the rental of office space, United States Post Office Boxes, mail boxes with Commercial Mail Receiving Agencies (i.e. United Parcel Service, Federal Express, etc,) and/or telephone and internet service by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith and/or utilizing any of the business names set forth in subparagraph (a) above, including lease/rental agreements, contracts, statements, applications, and records reflecting the dates, amounts and methods of payments made for rental of office space, United States Post Office Boxes, mail boxes with Commercial Mail Receiving Agencies (i.e. United Parcel Service, Federal Express, etc,) and/or telephone and internet service;

f.      Credit card records for any and all credit card accounts opened, used or controlled by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler, a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; and/or utilizing any of the business names set forth in subparagraph (a) above, including and limited to:  statements, applications, records reflecting items purchased and the dates such items were purchased, and records reflecting the dates, amounts and methods of payments made on any such accounts;

g.      Evidence relating to the acquisition of assets: by Sergiy Bezrukov a/k/a Sergiy Bezroukov, a/k/a Thomas Paris, a/k/a John Butler,

a/k/a Christopher or Chris Riley, a/k/a Robert Foss; Vanessa Cardona a/k/a Emily Goldstein; Desirea Lovell; Dustin Walker; Mark Farnham; Travis Doner; Christopher Terhune; Nicole Barber; Sherry Sylka; Amber Steward; Cassandra Baldwin; Tony Stebbins; Tanya Whitwood; Paul Shelburne; Lindsay Ullman; Bobbi Doner; Dylan Dean; David Smith; individually, or utilizing any of the business names set forth in subparagraph (a) above, including and limited to: real estate records, vehicle titles and other records, loan records, records relating to brokerage accounts, and records relating to the purchase of stocks or other investments;

h.   <u>Computers and Electronic Media</u>: The seizure and/or copying of the below electronic media and related materials to allow for and assist in the search for the records and items listed above in a forensic laboratory setting:

    1)   All of the above-described documentation and records stored on/in computer floppy disks, thumb devices, CD's, DVD's, tape media, or other electronic media that may contain copies of computer programs and/or files.

    2)   All of the above-described documentation and records stored on/in computer hardware to include, but is not limited to, any data processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices and electronic tone-generating devices); as well as any device, mechanism or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

    3)   Computer software stored in electronic, magnetic, optical or other digital form. Including programs to run operating systems, application (like word processing, graphics or spreadsheet programs), utilities, interpreters, and communications programs.

4) Computer-related documentation consists of written, recorded, printed or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

5) Computer passwords and other data security devices designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusual, as well as reverse the process to restore it.

6) Keys, passwords or combinations used to secure items stored in a safe or similar locked box or compartment or computer or other electronic device within the premises described in **Attachment A**. All items more fully described in **Attachment B** that are stored in any such safe, locked box or compartment.

i.   Cellular Telephone(s):

1) Cellular telephones frequently have telephone directory features, as well as methods to learn the telephone number associated with other cell phones.  Cellular telephones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names.

2) Cellular telephones typically have voice mail and/or text-messaging features, which permit the cellular telephone user to send and receive voice mail and/or text messages.  Voice mail and text messages are typically stored on the computer network of the provider of the cell phone's telephone service, which network is external to the cell phone.  Sent and received text messages may also be stored on the cell phone itself.

3) Cellular telephones with camera functions permit the cell phone user to take photographs and/or videos that are stored on the cell phone itself.

4) The information described in subparagraphs (g), (h) and (i) above, usually remains accessible in the cell phone's memory card even if the cell phone has lost all battery power, and not been used for an extended period of time.

5) Certain electronic devices, including i-Phones, Blackberries, i-Pods, and Android phones, store information such as email messages, chats, multimedia messages, installed applications or other electronic communications, calendars, notes, passwords, dictionary entries, Global Positioning Satellite (GPS) entries, internet protocol connections, and location entries, including cell tower and WiFi entries, and internet or browser entries or history.  In addition, these devices often contain proprietary software, in the form of system, data, or configuration information, which enable the types of information and data described above to be accessed and analyzed.  These items remained stored on the electronic devices even if the device in question has lost all battery power, and has not been used for an extended period of time.

j. Surveillance Monitoring Equipment: any surveillance monitoring system(s) and storage media associated with such a system, whether recorded in an analog or digital format, including video recordings from such equipment.

k. Photographs: entry and exit photographs of the locations to be searched, as well as photographs of the specific places in which items are found and from which items are seized.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

STATE OF NEW YORK )
COUNTY OF ERIE       )     SS:
CITY OF BUFFALO    )

I, CLINTON E. HOMER, being duly sworn, deposes and says:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Postal Inspector for the United States Postal Inspection Service stationed at the Buffalo, New York Field Office, and have held such position since July 6, 2005.  I am currently assigned to investigate Postal Crimes within the Western District of New York.

2.      As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      I make this affidavit in support of an application for a warrant to search the business offices of Corporate Restructure, Inc. (Corporate Restructure), under the ownership and/or direction of Sergiy BEZRUKOV, at 255 Rochester Street, Suite 6, Salamanca, New York, 14779, and 1841 Seneca Street, Buffalo, New York, 14210, descriptions which are more fully set out and described in **Attachment A** of this Affidavit.

4.      The statements contained in this Affidavit are based upon my investigation, information provided by other law enforcement, information provided by bank fraud investigators, interviews conducted by your affiant, documents and records obtained by your affiant, and on my experience and training as a Postal Inspector.  Because this Affidavit is

being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me and have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence and fruits of violations of Title 18, United States Code, Section 1341 (Mail Fraud) exist at the aforementioned location.  The evidence and fruits of the crime to be searched for and seized are more fully set out in **Attachment B** of this Affidavit.

## DETAILS OF INVESTIGATION

5.     The scheme involves Sergiy BEZRUKOV's, a/k/a John Butler, a/k/a Thomas Paris, a/k/a Christopher Riley, a/k/a Chris Riley, a/k/a Robert Foss (hereinafter BEZRUKOV), use of the United States Postal Service to mail solicitations to small business owners and to send baseless complaints to attorneys and various state offices in support of his scheme.  In order to aid in hiding the location of his business as well as foster his processing of illicit funds received from his clients, this investigation has established that BEZRUKOV operates under at least 30 different business names, processes and moves funds through at least 10 different banks, and employs a number of U.S. Postal Service Post Offices Boxes and Commercial Mail Receiving Agent (CMRA) boxes at UPS Stores in the Western New York area.  This scheme is detailed more fully below.

6.     As more fully set out below, this investigation has developed probable cause to believe that Corporate Restructure, under the ownership and/or direction of BEZRUKOV, has committed violations of Title 18, United States Code, Section 1341 (Mail Fraud) by devising and participating in a scheme to solicit small business owners in order to defraud the

small businesses (hereinafter victim companies) by convincing them that he and his business would restructure and repay the victim companies owners' short-term debt in exchange for a fee.

7.   Section 1341 of Title 18 of the United States Code provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by false pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowing causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title, or imprisoned not more than 20 years, or both.

8.   This investigation has revealed that fees from the victim companies had been collected almost daily, up to several months at a time, and that no debt repayment or restructuring ever took place.  As a result, the victim companies default on their short-term loans, leading to additional fees, a negative reflection on their credit rating, and/or legal proceedings.  Once a victim company realized they had been deceived and defrauded by BEZRUKOV or his companies, they would attempt to make contact with them, however, BEZRUKOV would cease all contact with the victim companies.

9.   On or about August 26, 2016, the Postal Inspection Service received a referral from a fraud investigator for Citizens Bank related to multiple accounts with similar

3

suspicious activity. One of the accounts opened at Citizens Bank used a U.S. Post Office box as the account holder's address of record. The U.S. Post office Box used was rented to BEZRUKOV.

10.     The suspicious accounts involved deposits of a large number of paper drafts, many of which were being returned as worthless. A paper draft is similar to a check and includes the name of the business or individual whose account the draft is drawn against, and the bank routing number and account number of the business or individual. The drafts are often unsigned, and result from a business or individual granting another authority to make withdrawals against their account. Paper drafts are often used in the normal course of business between two parties conducting business with each other. In the instant case, when a paper draft cleared, all withdrawals from the accounts were received in the form of cash or official bank check.

### A. Citizen's Bank

MARK FARNHAM

11.     The Citizens Bank fraud investigator confirmed that Citizens currently held checking account ending 3553, opened June 10, 2016, and checking account ending 3618, which had been opened June 24, 2016. Each account was opened at a different branch, but both accounts had been opened under the business name "Enterprise Source SPA LLC", with the sole authorized signor being Mark Farnham (FARNHAM). The address of record for the accounts was 35 Chestnut Street, Suite 161, Salamanca, NY, 14779. Each account had been funded with a $100.00 deposit.

4

12.     The address 35 Chestnut Street, Salamanca, NY, 14779 is the address of the U.S. Post Office for Salamanca, New York. FARNHAM is not employed there and does not reside there. Use of a post office box number to list a suite number on an address is often a tactic used in fraudulent schemes to give potential victims the impression that an individual or business has physical office space in a multi-unit building, rather than simply a P.O. Box for receiving mail.

13.     Your affiant obtained a copy of the application for post office box number 161 from the Salamanca Post Office. The box was opened on December 26, 2015 by BEZRUKOV. BEZRUKOV opened the box to receive mail for three listed businesses, (1) SBC Telecom Consulting Inc.; (2) Corporate Restructure, Inc.; and (3) NBR Solutions Inc.

14.     On December 26, 2015, BEZRUKOV also opened post office box number 171 at the Salamanca Post Office, to receive mail for two of his businesses, namely, SBC Telecom Consulting Inc. and Corporate Settlement Corporation. BEZRUKOV continues to maintain both post office boxes at the Salamanca Post Office.

15.     Between June 21, 2016 and August 12, 2016, approximately $103,944.73 was deposited into FARNHAM's Enterprise Source SPA LLC checking accounts ending in 3553 and 3618. The majority of the funds deposited were in the form of unsigned paper drafts, most drawn against the accounts with business names rather than individuals. The businesses often listed addresses, or partial addresses, from throughout the United States. The deposits were made at several Citizens Bank branches.

16.     Beginning in mid-August 2016, several paper drafts deposited into FARNHAM's Enterprise Source SPA LLC checking accounts were returned unpaid. Much like a non-sufficient funds check, a paper draft is returned to the depositing bank when either the maker's account does not have the funds to cover the check, or the maker has withdrawn authorization for the depositor to make withdrawals from the account.

17.     In mid-September 2016, Citizens Bank made contact with the owner of one of the businesses whose drafts were deposited in July 2016 into FARNHAM's Enterprise Source SPA LLC checking account ending in 3553. The business, identified here as TDACC is owned and operated by A.J.S. The bank investigator inquired about the nature of the bank drafts A.J.S. had authorized FARNHAM to make. A.J.S. said he was having his short-term, high interest debt consolidated and reduced by "a company" which had sent him paperwork to fill out, which among other things included a form granting the company authority to make regular withdrawals from A.J.S.'s business checking account.

## DUSTIN WALKER

18.     The Citizens Bank fraud investigator also stated that Citizens currently held a checking account ending 7787, opened August 3, 2016, under the business name Open Integrated Solutions, LLC, with the sole authorized signor being Dustin A. Walker (WALKER). The address of record for the account was 1839 Seneca Street, Suite 101, Buffalo, NY, 14210. The account had been funded with a $100.00 deposit.

19.    Throughout August 2016, the deposit and withdrawal activity of WALKER's Open Integrated Solutions, LLC account consisted of deposits of unsigned paper drafts drawn against business accounts and withdrawals which were either by cash or official bank check. This activity was similar to the activity of FARNHAM's Enterprise Source SPA LLC accounts. Beginning in late August 2016, drafts began to be returned to Citizens Bank as unpaid.

20.    In early September 2016, the fraud investigator for Citizens Bank spoke to WALKER via telephone. WALKER confirmed his office address at 1839 Seneca Street, Suite 101, Buffalo, NY, 14210, and stated he paid rent for the space to "John Butler".

FARNHAM AND WALKER

21.    As part of Citizens' Bank routine follow through when it identifies suspected fraudulent activity with accounts, the bank sends a canvassing alert to other area banks, listing the suspect company and authorized signor information. Several responses were received from several area banks stating that they were aware of FARNHAM and WALKER. Both FARNHAM's and WALKER's banking activities had drawn attention due to the deposits of paper draft, cash and official bank check withdrawals, and returned unpaid paper drafts. It was also noted that neither FARNHAM's or WALKER's accounts showed normal business expense activity, such as rent, utilities, materials purchased or payroll payments.

**B. Use of the U.S. Mail**

22.     Following up on the original information received from Citizens Bank, your affiant obtained various records from the United States Postal Service.  In the normal course of business, the Postal Service maintains records related to post office boxes (P.O. Boxes), bulk mailings, postage permits, accountable mailings (Certified, Express, Registered, etc.), and Commercial Mail Receiving Agencies (CMRA).  A CMRA is a business such as a UPS Store, or FedEx Kinkos Store, which is authorized by the United States Postal Service to receive mail on behalf of customers.

23.     In addition to the two P.O. Boxes opened by BEZRUKOV at the Salamanca Post Office, FARNHAM opened three additional P.O. Boxes, two at the Irving, New York, post office, and one at the Sanborn, New York, post office.  Each of the aforementioned P.O. Boxes were used as part of this scheme to defraud.

24.     On or about June 22, 2016, FARNHAM completed an application to open a P. O. Box at the Sanborn Post Office and was assigned Box 181.  He provided his New York State Driver's License as proof of identification, and the company name Enterprise Source SPA LLC, with an address of 100 Merden Street, Salamanca, NY, 14779, his home address from his New York State Driver's License.

25.     On or about July 7, 2016, FARNHAM completed applications to open P. O. Box numbers 298 and 338 at the Irving Post Office.  FARNHAM provided his New York State Driver's License as proof of identification, and the company name JCM Process FLR

LLC, with an address of 35 Chestnut Avenue, Rm 4, Salamanca, NY, 14779 for his address. The U.S. Post Office in Salamanca is located at 35 Chestnut Street. Postal records indicate that FARNHAM used cash to pay for the box rental and authorized Dustin WALKER as a mail recipient.

26.    On or about August 1, 2016, FARNHAM completed an application at the Salamanca, New York Post Office to mail "Standard Mail" with the United States Postal Service. The application would allow FARNHAM to send large volumes of Standard Mail with the Postal Service, by pre-printing the required postage on each envelope in his mailings. Such a permit also provides for possible discounts, based on volume and presorting of mailings.

27.    FARNHAM provided his New York State Driver's License for identification on the application for the permit for his business, JCM Process FLR LLC. The address for his business was listed as 255 Rochester Street, Suite 6, Salamanca, NY, 14779. This is the same business name FARNHAM provided on his Irving P.O. Box applications. The 255 Rochester Street, Suite 6, Salamanca, NY address is the location of office space approximately 1 mile from the Salamanca Post Office. The application was approved, and FARNHAM was issued Permit number 255.

28.    On or about August 12, 2016, the first bulk mailing was received for Permit number 255 at the Salamanca Post Office. The mailing was approximately 378 pieces. As required by Postal Service regulations, in order to ensure that the mailing met the

9

requirements for Standard postage, a copy of the contents of the mailing was provided to the Salamanca Post Office. The postage was paid in cash.

29.    The contents of the August 12, 2016 mailings consisted of two pages. The sample given was addressed to a business in Illinois, including the notation, ATT: ORIGINAL LOAN ID 4334-11. The return address on the mail piece was 1902 Ridge Road, #181, West Seneca, NY, 14224 which is the address of a UPS Store. The letter is from "Chris Riley, a Corporate Debt Advisor of the company Native Corp Restructure." The body of the letter explained that the company could reduce the business debt of the addressee by up to 75% within 6-12 hours by restructuring their debt.

30.    The subsequent mailings under Permit 255 increased in volume and frequency throughout August 2016. Throughout September and continuing to at least October 7, 2016, the mailings under Permit 255 followed a regular pattern. Three to five days per week, one or more individuals brought three, 2 foot trays of mail in the morning, and three, 2 foot trays of mail in the afternoon to the Salamanca Post Office. Every three trays contained 1,250 pieces of mail, for a total of 2,500 pieces per day. Since opening Permit 255 on August 1, 2016, JCM Process FLR LLC mailed approximately 75,000 pieces of mail from the Salamanca Post Office. According to Postal records, all mailings were paid for with cash.

31.    On or about October 7, 2016, a copy of a new letter being mailed under Permit 255 was provided to the Salamanca Post Office, along with the daily mailing. It also was a two-page mailing, the body of which offered to reduce business debt by up to 50%. The letter

10

was addressed to a business in California, along with the notation, REF: ORIGINAL ADVANCE # NY6631. The business name it was being sent under was IDEBT, LTD on one page, and INDI Debt on the other. The return address was 2901 Niagara Street, #181, Sanborn, NY, 14132. The return address is the P.O. Box FARNHAM holds at the Sanborn Post Office under the company name "Enterprise Source SPA LLC". The letter directs the addressee to contact "Corporate Collection Solutions Expert, Robert A. Foss".

32.     Your affiant also reviewed accountable mail records for 2016 at the Salamanca Post Office. Accountable mail is mail with tracking, requiring a signature by the addressee to prove acceptance when delivered. Generally, approximately 25 pieces of Priority Mail Express were sent from the Salamanca Post Office for each month between January and July 2016. Beginning in August 2016, outgoing Priority Mail Express from the Salamanca Post Office increased dramatically during the months of August and September 2016, having well over 100 pieces of Priority Mail Express, per month, most which were part of this scheme.

33.     When a Priority Mail Express piece is mailed, it must be presented at a U.S. Post Office customer counter, in order to be officially accepted and accounted for by the Postal Service. Because the delivery service is guaranteed, a Postal clerk must accept the item, and make certain notations on the address label, including date and time of acceptance, amount of postage paid, and the scheduled delivery date. The Post Office also retains a carbon copy of the address label for their records.

34.     There were a number of labels with Community Legal Aid Services, 35 Chestnut Street, #161, Salamanca, NY, 14779 listed as the sender's address. This is one of the P. O. Boxes BEZRUKOV maintains at the Salamanca Post Office.

35.     There were a number of labels with Seneca BPO, 35 Chestnut Street, #171, Salamanca, NY, 14779 listed as the sender's address.  This is one of the P.O. Boxes BEZRUKOV maintains at the Salamanca Post Office.

36.     There were a number of labels with Seneca BPO, Clear Call Systems Inc., or Salamanca Payroll Services Inc., (one which also listed c/o John Butler), 255 Rochester Street, Suite 6, Salamanca, NY, 14779 listed as the sender's address.  This is the address of Permit 255 at the Salamanca Post Office in FARNHAM's name.

37.     There were a number of labels with Seneca BPO, 266 Elmwood Ave., #950, Buffalo, NY, 14222 listed as the sender's address. The address is that of the UPS Store located at 266 Elmwood Avenue in Buffalo, NY.

38.     The evidence established that the more than 200 additional Priority Express Mail pieces from August and September are linked together as a part of the scheme being investigated. According to Postal records, all Priority Mail Express pieces were paid for with cash. The sending of Priority Mail Express pieces as part of this scheme has continued through October 2016.

39.   A CMRA is a business authorized to accept U.S. Mail on behalf of their box-holders.  The authorization is applied for through an application process with the United States Postal Service.  The CMRA itself needs to complete an application, as does each box-holder at the CMRA.  The individual box-holder application is called a "PS Form 1583, *United States Postal Service Application for Delivery of Mail Through Agent*."  Both the CMRA and the local delivery post office (the post office which delivers the CMRA box-holders' mail to the CMRA each day) retain copies of all applications.

40.   A copy of the PS Form 1583 for box number 131 at the UPS Store located at 708 Foote Avenue, Jamestown, New York, 14779, was obtained from the Jamestown Post Office.

41.   Box 131 was issued to BEZRUKOV on January 16, 2016, for his business named National Business Relief LLP.  BEZRUKOV listed the business address as 35 Chestnut Street, #163, Salamanca, New York, 14779.

42.   A copy of the PS Form 1583 for box number 181 at the UPS Store located at 1902 Ridge Road, West Seneca, New York, 14224 was obtained by your affiant.

43.   Box 181 was issued to FARNHAM on July 5, 2016, for a business named JCM Process FLR LLC.  FARNHAM listed the type of business as "flooring", and the location as 62 Clinton Street, Apartment 2, Salamanca, NY, 14779.

44.     A copy of the PS Form 1583 for box number 950 at the UPS Store located at 266 Elmwood Avenue, Buffalo, New York, 14222 was reviewed by your affiant.

45.     Box 950 was issued to BEZRUKOV on January 16, 2016, for his business named Hosted Call Center.  BEZRUKOV listed the address for the business as 35 Chestnut Street, Salamanca, New York, 14779.  This is the address of the Salamanca Post Office, where BEZRUKOV maintains two post office boxes.

### C. Victims of the scheme

**Victim #1**
**Company – TDACC**
**Owner - A.J.S.**

46.     On or about September 16, 2016, your affiant spoke with A.J.S., the owner and operator of TDACC, a company based outside of New York State.  A.J.S. said he has owned and operated TDACC for approximately 4½ years.  He said during that time, he has regularly used credit card cash advances and other short-term, high interest borrowing options to support his business.

47.     In early 2016, A.J.S. received a solicitation letter in the mail from Corporate Restructure, offering A.J.S. the opportunity to reduce his short-term, high interest debt by as much as 75%.  A.J.S. responded to the solicitation and began telephone and email conversations with persons who used the names "Thomas Paris" and "Emily Goldstein" from Corporate Restructure, Paris and Goldstein represented that they had their main office

14

in Salamanca, New York, and an additional office in Jamestown, New York, located at 708 Foote, Avenue, #131, Jamestown, New York, 14701 (Jamestown address).

48.     A.J.S. said he worked with Paris and Goldstein over several weeks to work out the terms of their debt restructure plan for him.   Ultimately, A.J.S. was provided with a contract and several other forms to complete, sign and return to Corporate Restructure, Inc. at their Jamestown address.   One of the forms authorized Corporate Restructure to make withdrawals from A.J.S.'s TDACC business account.   A.J.S. was led to believe the withdrawals were to cover the following expenses: (1) the majority would be used to pay down A.J.S.'s original debt; (2) a portion was to pay for legal costs incurred by Corporate Restructure as part of the restructuring plan; and (3) the remainder went to Corporate Restructure as a fee for their services.   A.J.S. was directed to block the original lenders from making withdrawals from his bank account, and to have no more contact with those lenders since Paris and Goldstein would represent him with the lenders going forward.

49.     A.J.S. said he began to grow suspicious of Paris, Goldstein and Corporate Restructure after a few months.   Withdrawals from his business account became more frequent, in greater amounts, and used to pay companies other than those he originally agreed to pay.   He said Paris and Goldstein became harder to contact and were very vague when describing the status of the debt restructure plan for A.J.S. and his business.   When asked, Paris and Goldstein assured A.J.S. that the varying company names associated with each withdrawal from his account related to different divisions and functions of their debt restructuring business.

50.     AJ.S. eventually became aware that one of his original lenders had filed a judgment against him because repayment of his loan with that company had ceased when A.J.S. stopped making payments, as he was instructed to do by Paris and Goldstein.

51.     At the conclusion of the interview, A.J.S. agreed to send your affiant copies of all documentation and email exchanges he had retained from his experience with Corporate Restructure, Thomas Paris and Emily Goldstein.  Your affiant received that packet which contained copies of documents relevant to Paris, Goldstein and various businesses, including Corporate Restructuring, Inc.

52.     Included in the packet of documents received from A.J.S. was a copy of the contract Corporate Restructure had prepared for A.J.S. to sign. Included in the terms of the contract under the heading "Payments to Creditors", was the following: "As long as my installments are up to date, payments to creditors will be made according to the settlement terms."  Under the heading "Creditor Communication", was the following: "If creditors continue to contact me after I enroll in CR's (Corporate Restructure) program, I will refer all calls and correspondence to CR."

53.     Also included in the packet from A.J.S. was a copy of a document, advising A.J.S. to return the signed contract and other documents via FedEx to Corporate Restructure at 708 Foote, Avenue, #131, Jamestown, New York, 14701.

54.     On or about October 12, 2016, your affiant received information from a representative of Pearl Beta Funding, LLC, an original lender of funds to A.J.S and TDACC. In or about April 2016, A.J.S. defaulted on his loan agreement with Pearl Beta Funding, LLC by ceasing to provide daily payments as agreed.  Pearl Beta Funding, LLC never received another payment toward satisfaction of the loan and did not receive any correspondence related to a restructure of the original loan.

55.     On or about October 12, 2016, your affiant received information from a representative of Signature Funding, LLC, an original lender of funds to A.J.S. and TDACC. In or about April 2016, A.J.S. defaulted on his loan agreement with Signature Funding, LLC by ceasing to provide daily payments as agreed.  Signature Funding, LLC never received another payment toward satisfaction of the loan and did not receive any correspondence related to a restructure of the original loan.

**Victim #2**
**Company- GP&M**
**Owner - R.B.**

56.     On or about September 20, 2016, your affiant spoke with R.B., owner and operator of GP&M, based in New York State.  R.B. said he has owned and operated GP&M for approximately 38 years.  In late 2015 or early 2016, R.B. had a need for an infusion of capital to purchase production materials for his business.  R.B. entered into a loan agreement with Merchant Cash and Capital, LLC.  The repayment terms called for R.B. to repay

approximately $14,000.00 for a $10,000.00 loan over the course of four to five months. R.B. authorized the lender to make daily withdrawals of $124.82 from the GP&M business account until the debt had been paid.

57.     Approximately two months into the repayment term, R.B. received a solicitation in the mail from Corporate Restructure. The letter described Corporate Restructure as a debt restructuring company who could help small businesses reduce debt by up to 75%. R.B. called the telephone number provided, and began regular telephone and email communication with "Thomas Paris" of Corporate Restructure

58.     Paris convinced R.B. that he could restructure his debt, at a lower interest rate, resulting in a lower amount due with longer repayment terms. R.B. agreed to move forward with Paris and Corporate Restructure after Paris requested, and R.B. provided Paris with six months' worth of banking history and documents, Paris sent R.B. a contract and other forms to complete for a debt restructure plan.

59.     R.B. completed all of the required paperwork, which included in part, authorization for Corporate Restructure to make a daily withdrawal of $74.00 from R.B.'s GP&M business account. R.B. was directed by Paris to block the original lender from making withdrawals from R.B.'s account and to cease all contact with them. Paris told R.B. that Corporate Restructure would now represent him in the repayment of his loan.   R.B.

was told by Paris that the daily $74.00 withdrawals were to cover payments to Merchant Cash and Capital, legal fees during the re-negotiation process and a small fee for Corporate Restructure.

60.     R.B. said he became suspicious of his relationship with Paris and Corporate Restructure after receiving a telephone call from the Westchester, New York County Clerk's Office, advising him he needed to appear in court. R.B. immediately reached out to Paris, who advised him he didn't need to appear at the court appointment. Further concerned, R.B. consulted with an attorney, who advised he should take a close look at his GP&M business account.

61.     After consultation with his attorney, R.B. went to his bank and had Corporate Restructure removed as an authorized payee from his account. The following day R.B. was surprised to see a $74.00 withdrawal from the account. R.B. contacted his bank, who explained that Corporate Restructure had added several additional company names to the list of those authorized to make withdrawals from R.B.'s account and that each one would need to be removed individually. R.B. reviewed the list of users added by Corporate Restructure and removed the ones he had not specifically authorized to make withdrawals. R.B. eventually changed his bank account number.

62.     R.B. has provided your affiant copies of all documentation he retained from his dealings with Paris and Corporate Restructure.

19

63.     Included in the packet of documents received from R.B. was a copy of the contract Corporate Restructure had prepared for R.B. to sign, to secure his debt repayment/restructure relationship. Included in the terms of the contract under the heading Payments to Creditors, was the following: "As long as my installments are up to date, payments to creditors will be made according to the settlement terms." Under the heading Creditor Communication, was the following: "If creditors continue to contact me after I enroll in CR's (Corporate Restructure) program, I will refer all calls and correspondence to CR."

64.     Also included in the packet received from R.B was a copy of an email from Paris to R.B., with a copy to "Emily Goldstein", advising R.B. to return the signed contract and other documents via FedEx to Corporate Restructure at 708 Foote, Avenue, #131, Jamestown, New York, 14701. The email is signed, "Thomas Paris, Trial Paralegal, Corporate Restructure, Inc."

65.     On or about October 11, 2016, your affiant received information from a representative of Merchant Cash and Capital, LLC, the original lender of funds to R.B. and GP&M. In or about February 2016, R.B. defaulted on his loan agreement with Merchant Cash and Capital, LLC by ceasing to provide daily payments as agreed. Merchant Cash and Capital, LLC never received another payment toward satisfaction of the loan and did not receive any correspondence related to a restructure of the original loan.

**Victim #3**
**Company - TSD**
**Owner - A.M.S.**

66.     On or about September 20, 2016, your affiant spoke with A.M.S., owner and operator of TSD, a business located outside of New York State. A.M.S. has co-owned TSD since 2010. In early 2015, A.M.S. and her partner wanted to expand the business. Since they did not qualify for traditional lending options, TSD entered into an agreement with Yellowstone Capital, LLC. The terms of the loan provided TSD with $30,000.00, for which they had to repay $47,000.00 within approximately 4 months. The agreement authorized the lender to make daily withdrawals of approximately $400.00 from TSD's account until the $47,000.00 was paid.

67.     TSD paid the full $47,000.00 to settle the initial loan and agreed on a second loan from the same lender to make additional improvements to the business. TSD contracted to borrow $30,000.00 for the second loan, paying approximately $47,000.00 at a rate of $400.00 per day.

68.     Before TSD had completed the full repayment of the second loan, TSD received a solicitation in the mail from Corporate Restructure in or about in November 2015. The letter advised A.M.S. that Corporate Restructure could reduce the short term debt of TSD by up to 75% within 48 hours. A.M.S. responded to the letter by calling the telephone number provided, resulting in her working with "Thomas Paris" and "Emily Goldstein" over the telephone and via email, to restructure TSD's short-term, high interest debt.

69.     A.M.S. stated that Paris and Goldstein described Corporate Restructure as a company that represents small businesses which are being taken advantage of by short-term high interest lenders. Paris and Goldstein told A.M.S. that Corporate Restructure would work through the courts to get TSD's interest rate reduced and repayment term extended, resulting in a reduction in their payments to Yellowstone Capital from $400.00 per day to $1,500.00 per month. A.M.S. agreed to Paris' and Goldstein's offer.

70.     A.M.S. received a contract and several other forms from Corporate Restructure, which she completed and returned. Once making the initial $1,250.00 payment to Corporate Restructure, Paris and Goldstein advised A.M.S to block Yellowstone Capital from making withdrawals from the TSD account, and to cease all contact with Yellowstone Capital since Corporate Restructure would be representing TSD in the repayment going forward.

71.     Before completing the payments to Corporate Restructure, A.M.S. was contacted by a debt collector for Yellowstone Capital who advised that TSD's loan was in a default status due to non-payment. After receiving that information, A.M.S. continually attempted to contact Paris and Goldstein by telephone and email with no response. Once A.M.S. emailed Goldstein informing her TSD had decided to sever their relationship with Corporate Restructure A.M.S. received an immediate response from Goldstein, informing her TSD had been fired as a client due to non-payment.

72.     A.M.S. sent your affiant copies of all documentation she had retained from her experience with Corporate Restructure, Thomas Paris and Emily Goldstein.

73.     Included in the packet of documents and correspondence received from A.M.S. was a copy of the contract Corporate Restructure had prepared for A.M.S. and her partner, to secure their debt repayment/restructure relationship. Included in the terms of the contract under the heading "Payments to Creditors", was the following: "As long as my installments are up to date, payments to creditors will be made according to the settlement terms." Under the heading "Creditor Communication", was the following: "If creditors continue to contact me after I enroll in CR's (Corporate Restructure) program, I will refer all calls and correspondence to CR."

74.     Also included in the packet received from A.M.S. was a copy of a second solicitation letter, dated March 23, 2016, received from Corporate Restructure which is similar to the initial letter received by A.M.S., as referenced above, despite the severed relationship between TSD and Corporate Restructure in December 2015. This two-page solicitation letter, with a return address of 266 Elmwood Avenue, Suite 950, Buffalo, New York, 14222, advised TSD that their debt could be reduced by up to 75% within 6-12 hours. The letter was signed by "Thomas Paris, Corporate Debt Advisor".

75.     On or about October 11, 2016, your affiant received information from a representative of Yellowstone Capital, LLC, the original lender of funds to A.M.S. and TSD. In or about November 2015, A.M.S. defaulted on her loan agreement with Yellowstone

Capital, LLC by ceasing to provide daily payments as agreed.  Yellowstone Capital, LLC never received any payments or correspondence from a third party, related to a restructure of the original loan.

### D. Former Employee #1 ("FE1") Interview

76.     On October 3, 2016, your affiant and other federal agents interviewed a former employee of Corporate Restructure. FE1 worked for Corporate Restructure for approximately three months, between June and August 2016.  FE1 reported to work Monday through Friday at Corporate Restructure's offices, located at 255 Rochester Street, Suite 6, Salamanca, NY, 14779.  Over the course of employment, FE1 performed such duties as computer and clerical work, and preparing and mailing of Priority Mail Express pieces at Corporate Restructure's owners direction.

77.     FE1 said the entire business was contained within the offices located at 255 Rochester Street, Suite 6 in Salamanca; the same building which houses a Cattaraugus County Probation Office.

78.     FE1 was referred to Corporate Restructure by another employee, a practice FE1 came to learn was the only way to get a job at Corporate Restructure, since new employees had to be trusted not to discuss where they worked with anyone.  On the first day, FE1 was interviewed by the Vice President of Corporate Restructure, Mark FARNHAM. FE1 never filled out an employment application or completed any employment tax forms.

79.     FE1 spent the first week being trained by the "Director of Operations", Travis Doner, as a paralegal.   FE1 said the training consisted of 4 hours per day, transcribing recorded telephone calls.   At the completion of the week, FE1 was introduced to the company president, "John Butler".   Butler promoted FE1 to begin working in the paralegal department the following Monday.   From the second Monday FE1 worked for Corporate Restructure through FE1's departure at the end of August, FE1 worked 8:00 AM to 4:00 PM at Corporate Restructure's 255 Rochester Street office located in Salamanca, New York.

80.     Once working in the paralegal department, FE1 was trained to "draw up contracts".   FE1 described this task as a process done on a computer, following templates created by Nikki Barber, another employee in the department.   FE1 informed your affiant that Barber had been trained to write the templates by Butler.

81.     The process to "draw up contracts" began with a packet being provided to FE1 by Butler.   Each packet contained a copy of an original loan agreement between a U.S. based small business and a short-term lender, recent bank statements for the small business, and recent loan re-payment information between the parties.   Based upon the state the lender and small business were located, FE1 used different templates to create a contract for the small business.   FE1 also drew up summonses and complaints based on templates created by Butler and Barber.

82.     FE1 said the paralegal department completed as many as 50 contracts per day, each being for a different small business.   Each contract was proof read by Butler before being finalized.

83.     FE1 said Butler controlled everything for Corporate Restructure, including creating several other company names to conduct business under.   FE1's office was right beside Butler's so FE1 could hear all of his telephone conversations through the wall.

84.     Regarding the documents created by Corporate Restructure and mailed out to the customers, FE1 said the process started in the mailroom, which was supervised by one of the employees who trained FE1 in the paralegal department.   Butler created a solicitation letter for small businesses, in which he promised to reduce a business's short term debt by half or more.   The letters were printed, folded, and sealed in envelopes in the mailroom.   Butler provided the list of small business names and addresses where the letters were to be mailed. FE1 stated that approximately 2,500 letters per day were produced and mailed from the Salamanca, NY Post Office.   The mailroom operation often continued through the day and into the evenings.

85.     FE1 stated that the letters sent out directed the small business to call "John Butler" or "Thomas Paris" to discuss the terms of their current loan, the restructured plan to reduce the debt, reduce the interest rate, and extend the terms.

86.     FE1's duties also included preparing and mailing USPS Priority Mail Express envelopes as directed by Butler.   The pieces mainly contained copies of the documents they created in house, or envelopes of cash.   FE1 would be given an unsealed Priority Mail Express envelope, with the contents and mailing address information inside.   When FE1 removed the

address information from the envelope in order to complete the address label, FE1 regularly saw the contents being mailed, including the contracts, cash and other documents.

87.     FE1 used various company names or the names of clients, as provided by Butler, for the return addresses on the Priority Mail Express labels.  FE was instructed by Butler to try to slightly alter hand-writing on each piece, so that each appeared to have been prepared and mailed by a different person.

88.     FE1 indicated that mail was sent to Butler's girlfriend, Vanessa Cardona, in White Plains, New York and cash was mailed to Miara, a company FE1 believed to be some sort of consulting firm.  FE1 had also prepared and mailed several Priority Mail Express pieces to Cardona.  Like the bulk solicitation letters, all Priority Mail Express pieces were mailed from the Salamanca, New York Post Office, often mailed by FE1.

89.     FE1 described Butler's office as having five or six computers at any given time. Butler replaced the computers used by the employees frequently even though they experienced no problems.  There was no filing system, just piles of papers on the desk and floor.  There was also cash and other records kept haphazardly in banker-boxes.

90.     FE1 said when Butler spoke on the telephone to potential clients he worked from a script Bulter created which told each business what they want to hear and pressured the business to sign on with his company to restructure their debt.

27

91. Once a company agreed to go forward with Corporate Restructure, the documents used to "draw up contracts" were obtained from the businesses. These documents included a copy of the original loan, the bank statements, and the recent re-payment records. Butler would email the "application packet" to be completed by the small business. The completed and signed packets were returned to Corporate Restructure via FedEx.

92. The application packet included authorization for Corporate Restructure to make daily or weekly Automated Clearing House (ACH) withdrawals from the client's bank account. ACH transactions are electronic transfers of funds between accounts, often used when one account-holder authorizes another to make regular direct withdrawals from their account.

93. Butler based the amount and terms on the bank statements sent to him at one of the UPS Boxes he controlled. The funds collected were allegedly to continue paying down the client's debt with the original lender while Butler worked to restructure their loan; to cover legal services provided by Corporate Restructure; and a fee to Corporate Restructure for their services. Butler kept all original documents in his office and provided the employees in the paralegal and accounting departments with copied of documents used to perform their duties.

94. FE1 is not aware of any communications between Corporate Restructure and any of the original lenders and never saw any evidence of any payments being made to any original lenders on the behalf of any clients.

95. Clients were never updated on the status of the restructure of their loans, FE1 stated that once a client became suspicious or impatient with the lack of service provided by Corporate Restructure, Butler "fired" the client and ceased all communication with them.

96. FE1 said all paper drafts used to make withdrawals from client accounts were created by Corporate Restructure. The employee who referred FE1 to Corporate Restructure for employment was the employee who used her computer and printer to create the paper drafts when FE1 worked at Corporate Restructure. The current employee responsible for creating all paper drafts was Chris Terhune.

97. FE1 indicated that each day a stack of paper drafts was provided to FARNHAM, WALKER and Doner to deposit.

98. FE1 said FARNHAM, WALKER and Doner spent the majority of each day driving to the Buffalo/Niagara Falls area to open new bank accounts and deposit checks or bank drafts created by the former accountant or Terhune. FE1 said it was a daily battle to be able to deposit the paper drafts and/or checks, because banks regularly shut down the accounts due to suspected fraud.

99. FE1 said the transactions themselves were often suspicious because of the volume and amounts of the drafts, and accounts were often closed or frozen when large numbers of drafts would begin to bounce. This occurred when a client became suspicious

and closed the business account the checks were drawn against. FE1 said there was concern among Butler, FARNHAM, WALKER and Doner that they would run out of banks to use.

100.    FE1 believes BEZRUKOV, FARNAM and WALKER were considering other options for obtaining and storing funds, including the use of checks, credit cards and debit cards. FE Had seen at least one credit or debit card in the office, issued by Chase Bank, embossed with "Dustin A. Walker, Open Integrated Solutions".

101.    FE1 stated that Butler's girlfriend, Vanessa Cardona, was also very active in the business, working by computer and telephone from White Plains, New York where she resided. Cardona used the alias "Emily Goldstein", a name which FE1 was familiar with from emails FE1 sent. FE1 emailed all documents she created to Butler via email address "jbutler@michaelsandmichaels.com".    Butler instructed FE1 to copy Cardona, a/k/a Goldstein on all items including contracts, complaints, summonses, etc. sent to Butler for his review.

102.    FE1 said Butler was very particular with his communications with clients. When dealing with clients either on the telephone or via email, he usually used the name Thomas Paris, but FE1 had also heard Butler use the name "Christopher Riley" in telephone conversations.

103.   FE1 stated that Butler always confirmed that a person calling had one of the solicitation letters in hand.   Each letter was coded with an account number, and that information was verified by Butler before the call could proceed.

104.   Butler controlled each call by following a script and at time transferred the calls to Cardona, under the Emily Goldstein alias.   Butler told FE1 the aliases were for their protection, but FE1 interpreted it as an obvious effort by Butler and Cardona to prevent clients from finding out who they were.

105.   FE1 said Butler regularly swapped out the computers and telephones of the business.   Several employees, including FARNHAM, WALKER and Doner were issued cellular telephones by Butler.

106.   FE1 was directed by Butler to set up a "spoof.com" account for WALKER for his cellular telephone.   A spoof.com account is an application which allows the user to spoof their telephone number to change the number the receiver of the call sees to make it appear to be local or from a particular area of the country.   FE1 suspected this was used so the telephones could be used to hide Corporate Restructure's true location, and to make calls posing as different clients.

107.   FE1 stated that employees at Corporate Restructure were paid in cash on Fridays and were not allowed to discuss where they worked with people outside the business. During the first couple of weeks of employment, FE1 received wages by check from Butler

via Salamanca Payroll Services.  Thereafter, FE1 was paid exclusively in cash, as were the other employees at Corporate Restructure. FE1 stated that Butler often went to his house on Fridays to get the cash used for payroll.

108.   Butler was usually the first person in the office each day, and often stayed until past the normal hours of 8:00 am until 4:00 p.m., with the exception of Fridays, when he often left about noon.

109.   FE1 stated that Butler began discussing moving his business to Canada, where he said the laws will be more protective because he believed it will be much more difficult for the short term lenders to file complaints or lawsuits against him in Canada.

110.   FE1 said the office at 255 Rochester Street, Salamanca, New York was secured with several cameras, inside and outside the building. Both the main entrance and Butler's office entrance were locked with keypads.

111.   FE1 stated that Butler, FARNHAM and WALKER often went to another office on the weekends.  FE1 believed that office was located in Buffalo, New York.  FE1 said FARNHAM and WALKER make themselves available to Butler 24 hours a day, 7 days a week.

112.   FE1 said that Tony Stebbins and a female whose name FE1 could not remember are current employees at Corporate Restructure who worked there while FE1 did.

The female took over many of FE1's duties; including preparing and mailing the daily Priority Mail Express pieces. The investigation has determined that the individual FE1 identified, but was unable to recall the name, is Desirea Lovell.

113.    FE1 left Corporate Restructure at the end of August 2016 but continues to keep in loose contact with some remaining employees. FE1 said based on her conversations with the remaining employees the business is run the same as when she was employed there.

114.    Independent of this investigation, FE1 was interviewed by law enforcement. At that time, FE1 positively identified John Butler, a/k/a Thomas Paris, a/k/a Christopher Riley. Your affiant knows that the individual FE1 identified is in fact Sergiy BEZRUKOV.

### E. Former Employee #2 ("FE2") Interview

115.    On or about October 4, 2016, FE2 agreed to speak with federal agents. FE2 worked for Corporate Restructure, Inc. at their 255 Rochester Street, Suite 6, Salamanca, New York address until June 2016. During that time, FE2 came to know several key employees, including Mark FARNHAM, Dustin WALKER, and the boss, who went by the names "John" or "Paris".

116.    FE2 worked in accounting, with job responsibilities which included making payment withdrawals from client's accounts and making checks to be cashed by Corporate Restructure and several other company names used by Corporate Restructure.

117.    FE2 indicated that no payments were ever made to any of the original lenders on behalf of Corporate Restructure clients.

118.    FE2 was skeptical of the business conducted by Corporate Restructure and as a result, FE2 quit working for Corporate Restructure in or about June 2016.

119.    Additional employees were identified through surveillance and various records obtained by your affiant throughout this investigation. They include: Bobbi Doner, Dylan Dean, David Smith, Lindsay Ullman, Paul Shelburne, Sherry Sylka, Amber Steward, Cassandra Baldwin and Tanya Whitwood.

## 255 ROCHESTER STREET, SUITE 6, SALAMANCA, NEW YORK and 1841 SENECA STREET, BUFFALO, NEW YORK

120.    On September 12, 2016, your affiant was conducting surveillance near the U.S. Post Office in Salamanca, New York. At approximately 9:00 AM, a blue, 2003 Dodge Ram 1500 pick-up, New York State license plate GVF7580, arrived from the direction of Rochester Street and parked at the post office. A white female with long, dark hair exited the vehicle carrying what appeared to be a Priority Mail Express envelope, and entered the post office. Your affiant entered the post office and confirmed the customer was mailing a Priority Mail Express envelope.

121.    After exiting the post office, the female left in the same vehicle she had arrived in, the blue, 2003 Dodge Ram 1500 pick-up, New York State license plate GVF7580. The

investigation has determined that this vehicle is registered to Desirea Marie Lovell of Franklinville, New York and the driver of the vehicle was determined to be Lovell.

122.    Your affiant followed Lovell who eventually drove to 255 Rochester Street, parked and entered the building.

123.    Agents continued to conduct drive-by surveillance of 255 Rochester Street in Salamanca, New York, as well as other addresses identified in this case, including 1841 Seneca Street, Buffalo, New York, 14210.

124.    On October 14, 2016, a gray Ford Explorer, New York State license plate HDY9308, and a red Ford 150 XLT pick-up truck, New York State license plate GCV1177, were observed parked behind 1841 Seneca Street, Buffalo, New York.  1841 Seneca Street is a small, brick, single story office building immediately to the South East of 1839 Seneca Street.

125.    The 2016 gray Ford Explorer, New York State license plate number HDY9308 is registered to SBC Telecom Consulting, Inc. of 261 West 35th Street, #600Q, New York, New York, 10001. This is the same company name and address Sergiy BEZRUKOV supplied to the Salamanca Post Office when opening his two post office boxes.

126.    The 2011 red Ford 150 XLT pick-up truck, New York State license plate GCV1177 is registered to Richard A. Walker, with an address of 544 Railroad Avenue,

Cherry Creek, New York, 14723.  This is the same address listed for the New York State driver's license issued to Dustin WALKER.


127.   On October 17, 2016, at approximately 8:05 AM, agents observed an older blue Dodge Ram pick-up truck parked in the side parking lot of 1841 Seneca Street.  Desirea Lovell could be seen sitting in the driver's seat of the vehicle.  At approximately 8:10 AM, the gray Ford Explorer identified the previous day, arrived and parked in the rear lot of 1841 Seneca Street.  Lovell exited her vehicle, walked to the rear of the building and appeared to enter.


128.   At approximately 10:45 AM, the red Ford 150 pick-up truck, arrived and parked in the rear lot of 1841 Seneca Street, next to the gray Ford Explorer.


129.   Shortly before noon, agents followed the 2011 red Ford XLT pick-up truck, New York State license plate GCV1177 when it left 1841 Seneca Street.  Agents observed the vehicle making stops at a Northwest Savings Bank branch and a KeyBank branch, before returning to park behind 1841 Seneca Street.  At each of the bank stops, agents identified Dustin WALKER when he exited the passenger side of the vehicle, carrying what appeared to be a white envelope or tri-folded piece of paper, entered the bank branch and remained for approximately 5 to 10 minutes.  The driver, a white male, remained in the vehicle during those stops.


130.   Agents again followed the 2011 red Ford XLT pick-up truck, New York State license plate GCV1177 when it left 1841 Seneca Street for a second time that day.  Agents

36

observed as the vehicle stopped and parked in front of the UPS Store located at 266 Elmwood Avenue, Buffalo, New York. WALKER exited the passenger side of the vehicle, entered the UPS Store then exited the UPS Store minutes after entering, and returned to the red Ford pick-up truck. WALKER opened the passenger side of the truck, reached inside, then stepped back and closed the door. He then proceeded to enter the KeyBank branch located next door at 274 Elmwood Avenue. Throughout the stop, the driver, a white male, remained in the vehicle. After approximately 5 minutes in the bank, WALKER exited and returned to the truck. The truck then returned to 1841 Seneca Street and parked.

131. The 2011 red Ford 150 XLT pick-up truck, New York State license plate GCV1177 left 1841 Seneca Street for a third time and was followed by agents. The driver of the red Ford pick-up truck was identified by agents as Mark FARNHAM with his passenger WALKER, drove to 1841 Seneca Street.

132. Records from KeyBank show WALKER deposited checks totaling in excess of $1,600.00 into an account in the name of Open Integrated Solutions, LLC on October 17, 2016. Open Integrated Solutions, LLC is the company associated with WALKER's suspicious Citizen's Bank account activity.

133. On October 18, 2016, Desirea Lovell was observed by agents sitting in her 2003 blue Dodge Ram pick-up truck in the side parking area of 1841 Seneca Street. Shortly

thereafter, an individual identified as BEZRUKOV arrived, driving the 2016 gray Ford Explorer, New York State license plate HDY9308, which he parked in the lot behind 1841 Seneca Street.

134.    On October 19, 2016, agents interviewed a tenant located at 255 Rochester Street, Salamanca, New York, 14779. The tenant accesses the building through a door at the opposite end of the hall from the door where BEZRUKOV's Corporate Restructure office space was accessed from.

135.    The tenant knew the business at the end of the hall to be a "call center", owned and operated by a white male who went by the name "John Butler".

136.    The tenant's space shared a common wall with the call center. The tenant said the call center was often quite noisy, describing the sound as that made by a large copier or printer. The tenant also said the call center received daily deliveries from Amazon, and the empty boxes left outside the building by the trash dumpster indicated the call center received numerous amounts of computers.

137.    The tenant said throughout August and September 2016, employees of the call center were regularly seen exiting their office, walking down the hall carrying trays of mail, loading the mail in a vehicle and driving away.

138.    In mid-October 2016, the tenants began observing the employees of the call center carrying banker boxes from the call center office and load them into vehicles.  This was done over a period of several days.

139.    On or about October 12, 2016, a U-Haul truck was observed after normal business hours parked directly in front of the entrance to 255 Rochester Street in Salamanca.

140.    After leaving 255 Rochester Street on October 19, 2016, your affiant received a telephone call from a tenant, and was informed that Travis Doner, known to your affiant as the Director of Operations for Corporate Restructure, had recently informed the tenant that the call center had closed.   Your affiant was informed that the prior week, John Butler had told his entire staff that the location was not making enough money, so he was closing it down, but he would continue to run his business from his Buffalo, New York, office.

141.    Later the same day, October 19, 2016, at approximately 4:35 PM, your affiant drove past 1841 Seneca Street in Buffalo, New York and observed a black Chevrolet Equinox parked in the rear lot behind 1841 Seneca Street.

142.    On October 20, 2016, agents conducted surveillance of 1841 Seneca Street, Buffalo, New York, 14210.  At approximately 7:50 AM, Desirea Lovell arrived and parked

her 2003 blue Dodge Ram pick-up truck in the side lot of 1841 Seneca Street. Lovell exited her vehicle, and used a key to access the front door of the building. After entering, Lovell turned on the lights.

143.   On October 20, 2016, at approximately 8:45 AM, your affiant was informed by a tenant at 255 Rochester Street, Salamanca, New York, 14779 that there was a black Chevrolet Equinox, New York State License plate HAW1163 parked outside the main entrance of the building. Further, one or more white males were removing white banker-box style boxes from the call center offices maintained by John Butler, and loading them in the back of the Equinox.

144.   The 2008 black Chevrolet Equinox, New York State license plate HAW1163 is registered to a resident of 106 Merden Street, Salamanca, New York, 14779. This is a residence immediately beside the address of residence listed on Mark FARNHAM's New York State driver's license, 100 Merden Street, Salamanca, New York, 14779.

145.   At approximately 9:20 AM on October 20, 2016, agents observed the 2016 gray Ford Explorer, New York State license plate HDY 9308 arrive and park in the lot behind 1841 Seneca Street.

146.   At approximately 11:15 AM on October 20, 2016, agents conducting surveillance saw that the window blinds hanging in the front of two windows at 1841 Seneca Street had been opened. Agents observed a white female with long, dark hair, matching the

likeness and description of Lovell, could be seen sitting at a desk, behind two or more computer screens.

147.   At approximately 11:45 AM on October 20, 2016, the 2008 black Chevrolet Equinox, New York State license plate HAW1163, arrived at 1841 Seneca Street, Buffalo, New York, and parked in the rear lot.  Two white males opened the rear hatch of the Equinox, and unloaded the contents, including white banker-box style boxes, to an area out of view behind 1841 Seneca Street.

148.   On October 21, 2016, at approximately 8:00 AM, agents conducted simultaneous surveillance in Salamanca, New York, near 255 Rochester Street and in Buffalo at 1841 Seneca Street, Buffalo, NY.

149.   At approximately 8:00 AM on October 21, 2016, the 2011 red Ford 150 XLT pick-up truck, New York State license plate GCV1177 registered to Richard A. Walker, was parked in the driveway of 106 Merden Street, Salamanca, New York, 14779.  Next door, at 100 Merden Street, the 2008 black Chevrolet Equinox, New York State license plate HAW1163 was parked in the driveway.  This is the address listed on the New York State driver's license of Mark FARNHAM.

150.   At approximately 8:18 AM, the 2008 black Chevrolet Equinox was parked in front of the main entrance of 255 Rochester Street, Salamanca, New York, with the rear hatch open.  Your affiant also parked in the parking lot of 255 Rochester Street, exited my vehicle

and approached the building entrance.  At that time, your affiant observed two white males, placing white banker-box style boxes in the rear cargo area of the Chevrolet Equinox.  The two white males entered 255 Rochester Street and your affiant followed.  They proceeded toward the door at the end of the hall, the access to BEZRUKOV's Corporate Restructure office space.  Your affiant entered a different office accessed from the same hallway.

151.    An agent who remained behind in a vehicle in the parking lot of 255 Rochester Street, continued to maintain surveillance of the Chevrolet Equinox.  The two white males made additional trips between the building and the Equinox, each time loading boxes into the rear of the vehicle.  The subjects finished loading the vehicle at approximately 8:40 AM, closed the rear hatch, entered the front driver and passenger seats of the vehicle, and left the area in the vehicle.

152..    Shortly thereafter, an agent picked up surveillance of the 2008 black Chevrolet Equinox, New York State license plate HAW1163, as it drove North on U.S. Route 219.  Surveillance of the vehicle continued to Seneca Street in Buffalo, New York.  As the vehicle approached 1841 Seneca Street, another agent picked up the surveillance.

153.    Surveillance at 1841 Seneca Street confirmed Lovell's blue Dodge Ram pickup and the gray Ford Explorer registered to SBC Telecom Consulting, Inc. had arrived and parked at 1841 Seneca Street.  A female, believed to be Lovell, could be seen inside the building, seated behind a desk.

154.    At approximately 9:58 AM, the 2008 black Chevrolet Equinox, New York State license plate HAW1163, parked in the rear lot of 1841 Seneca Street, Buffalo, New York. Three white males exited the vehicle and appeared to enter the rear of the building. A fourth white male, believed to be BEZRUKOV, approached the vehicle and removed a single item, then returned to the building. Over the course of approximately 10 minutes, one or more of the individuals proceeded to remove the contents of the cargo area, making multiple trips to the rear of the building. The items included white banker-box style boxes and what appeared to be a computer printer. Following removal of the last item, the rear hatch door was closed.

155.    Utilities records were obtained for 1841 Seneca Street, Buffalo, New York, 14210. National Fuel records show 1841 Seneca Street has a single active account in the name of Clear Call Systems. The service has been active in that name since February 25, 2016.

156.    National Grid records show 1841 Seneca Street has a single active account in the name of Clear Call Systems, a company owned by Sergiy BEZRUKOV. The service has been active in that name since the application was completed on February, 24, 2016. The application was signed, "Sergiy Bezrukov, President (of Clear Call Systems)".

157.    On October 25, 2016, your affiant was contacted by a tenant of 255 Rochester Street, Salamanca, New York and advised that one or more individuals had entered the space occupied by the call center. A description of one of the individuals was provided. Your

affiant, and another agent, responded to 255 Rochester Street and after approximately 10 minutes agents observed two white males exiting the building carrying a box. One of the white males matched the description provide to the agents. The white males left the parking lot in a red 2016 Ford and proceeded in the direction of Merden Street. Shortly thereafter, agents observed that same vehicle parked in the driveway of 100 Merden Street.

158.    Based on your affiant's knowledge of rented/leased spaces and the fact that they are rented until the end of the month or the end of the lease period, and the movement of the operation from 255 Rochester Street in Salamanca to 1841 Seneca Street in Buffalo, it appears that the operation is still being moved and therefore your affiant believes there are items to be seized in both the Salamanca and Buffalo locations. It appears that Corporate Restructure is in transition between 255 Rochester Street, Salamanca, New York and 1841 Seneca Street, Buffalo, New York and that items, including records, are still being retrieved as of October 25, 2016.

159.    In follow up to the information provided by FE1 regarding Butler's plans to move his business to Canada, a review of BEZRUKO's travel between the United States and Canada during 2016 revealed the following:

    2/21/2016 Peace Bridge (Inbound)
    5/30/2016 Peace Bridge (Inbound)
    6/19/2016 Peace Bridge (Inbound)
    7/04/2016 Peace Bridge (Inbound)
    8/06/2016 Peace Bridge (Inbound)
    8/21/2016 Peace Bridge (Inbound)
    9/11/2016 Peace Bridge (Outbound)
    9/11/2016 Peace Bridge (Inbound)
    10/08/2016 Rainbow Bridge (Outbound)
    10/10/2016 Rainbow Bridge (Inbound)

44

10/22/2016 Peace Bridge (Outbound)
10/24/2016 Peace Bridge (Inbound)
Record regarding outbound travel prior to 8/21/16 are unavailable.

## CONCLUSION

160.    Beginning on or before December 26, 2015 and continuing through at least October 25, 2016, Sergiy BEZRUKOV and employees of his business Corporate Restructure including Vanessa Cardona, Mark FARNHAM and Dustin WALKER, have aided and abetted each other to defraud small businesses under the guise of providing debt restructure and reduction services.  While operating from offices located at 255 Rochester Street, Suite 6, Salamanca, NY, 14779, and 1841 Seneca Street, Buffalo, New York, 14210, BEZRUKOV, FARNHAM, WALKER and others created and mailed thousands of solicitations which serve as the basis for the scheme.  All proceeds derived were obtained via paper drafts created at the 255 Rochester Street offices along with all supposed legal documents and debt restructure contracts.   The documents and contracts were prepared for mailing at 255 Rochester Street, Suite 6, Salamanca, NY, 14779, and mailed, using Priority Mail Express service, from the Salamanca, New York Post Office.  There is no evidence BEZRUKOV and Corporate Restructure, Inc. ever made any efforts to contact clients' original lenders, restructure client's loans, or make payments on clients' loans.  Based on agents' surveillance of 1841 Seneca Street and observations of the recent activities of BEZRUKOV, FARNHAM, WALKER and others, it is believed that BEZRUKOV is continuing to operate his fraudulent business from 1841 Seneca Street and that he has moved and continues to move, items and records from 255 Rochester Street, Salamanca, New York to 1841 Seneca Street, Buffalo New York.

161. Based on the foregoing, I respectfully submit that there is probable cause to believe that, items, records, and material used as part of the mail fraud scheme are contained inside the offices located at 255 Rochester Street, Suite 6, Salamanca, New York, 14779 and 1841 Seneca Street, Buffalo, New York, 14210, as described in **Attachment A**, for those items set forth in **Attachment B**, which items constitute evidence of and/or the fruits of Corporate Restructure, Inc., under the direction of Sergiy BEZRUKOV, fraudulent debt restructure and repayment scheme. The investigative efforts to date establish probable cause to believe that Corporate Restructure, Inc., under the direction of Sergiy BEZRUKOV, committed acts in violation of Title 18, United States Code, Section 1341 (Mail Fraud). Such efforts also establish probable cause to believe that evidence, fruits and instrumentalities of such violations will be found in Corporate Restructure, Inc., under the direction of Sergiy BEZRUKOV offices, in that the evidence shows that, since approximately December 26, 2015, Corporate Restructure, Inc., under the direction of Sergiy BEZRUKOV, has created solicitations for mailing and other documents in furtherance of their fraud, at 255 Rochester Street, Suite 6, Salamanca, New York, 14779.

162. Wherefore, in consideration of the foregoing, it is respectfully requested that this Court issue the requested search warrant authorizing the search of the offices of Corporate Restructure, Inc., under the direction of Sergiy BEZRUKOV, located at 255 Rochester Street, Suite 6, Salamanca, New York, 14779 and 1841 Seneca Street, Buffalo, New York, 14210, described in **Attachment A**, for the items described in **Attachment B**.

163.    Finally, it is respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory. Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and the premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

CLINTON E. HOMER
Postal Inspector
U.S. Postal Inspection Service

Sworn to before me this 27th day of
October, 2016.

H. KENNETH SCHROEDER, JR.
United States Magistrate Judge